FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINA

2011 APR 25  A 11: 48

CLERK US DISTRICT COURT
ALEXANDRIA, VIRGINIA

| | |
|---|---|
| **BIOTECHPHARMA, LLC**<br>1712 Brookside Lane<br>Vienna, VA 22182 | : <br> : <br> : <br> : <br> : |
| **Plaintiff,** | : <br> : <br> : |
| **v.** | : <br> : |
| **W.H.P.M., INC.**<br>9662 Telstar Avenue<br>El Monte, CA 91713 | : <br> : <br> : <br> : |
| **W.H.P.M. BIORESEARCH &**<br>**TECHNOLOGY CO., LTD.**<br>No. 2 Lou Zi Zhuang Central Street<br>ChaoYang District<br>Beijing, China 100018 | : <br> : <br> : <br> : <br> : <br> : |
| **and** | : <br> : |
| **JOHN WAN**<br>5358 Irwindale Avenue<br>Irwindale, CA 91706 | : <br> : <br> : <br> : <br> : |
| **Defendants.** | : <br> : <br> : |

Case No. 1:11CV444
(TSE|IDD)

## COMPLAINT

BiotechPharma, LLC ("BTP"), by counsel, brings its complaint for injunctive relief and monetary damages, including treble and punitive damages, against Defendants W.H.P.M., Inc. and W.H.P.M. Bioresearch & Technology Co., Ltd. (together "WHPM"), and their principal John Wan, jointly and severally.

## THE PARTIES

1.      Plaintiff BiotechPharama, LLC ("BTP") is a limited liability company organized and existing under the laws of the Commonwealth of Virginia, having its principal place of business in Vienna, Virginia.  BTP brings these claims on its behalf and as assignee of BiotechPharama Corp. and Fingerprint Biotech, LLC.

2.      Defendant W.H.P.M., Inc. ("WHPM-US"), is a corporation organized and existing under the laws of California, having its principal place of business in El Monte, California.  Upon information and belief, WHPM-US is a closely-held company controlled by Defendant John Wan and owned by Wan individually or together with his sister Zhijing Wan.

3.      Defendant W.H.P.M. Bioresearch & Technology Co. Ltd. ("WHPM-China") is a Chinese foreign investment company organized on June 14, 1993 in China, following the inception of WHPM-US on February 8, 1993.  WHPM-China's website states that it is United States-owned.  Upon information and belief, WHPM-China is a subsidiary of WHPM-US or is controlled and/or owned by John Wan and his sister Zhijing Wan.

4.      Defendant John Wan ("Wan"), upon information and belief, is a resident alien, residing in the State of California.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

6.      This Court has personal jurisdiction over Defendants because they caused tortious injury in Virginia, breached contractual obligations formed in Virginia, engaged in transactions

with BTP in Virginia, and, upon information and belief, regularly conducted or solicited business and/or engaged in other persistent course of conduct in Virginia.

7.   Venue properly lies in this District pursuant to 28 U.S.C. §1391(a)(2), (c), and (d), in that a substantial part and virtually all of the events and acts giving rise to this claim occurred in this District, and Defendants Wan and WHPM-China are aliens.

## FACTS

8.   BTP is a leader in technology and product development of biometric products for roadside testing of drugs and alcohol for law enforcement and government agencies. The company enables its customers to conduct highly sophisticated yet simplified one-step, saliva or urine-based tests for drugs and alcohol, while identifying the subject donor in less than five minutes.

9.   The founder and principal of BTP is Dr. Raouf Guirguis ("Dr. Guirguis"), who holds a Ph.D. in Physiology and Biophysics from Georgetown University. Dr. Guirguis is the inventor of the one-step drug test technology and has over 64 issued U.S. patents in the field of medical devices and rapid diagnostic test kits. His inventions are primarily focused on the collection, processing, and testing of body fluids in the field or at the point-of-care collection sites. Dr. Guirguis' inventions have included blood collection tubes, urine collection cups, and monolayer cytology for pap smear, which have been recognized worldwide by major diagnostic companies.

10.   BTP has two patents relating to its one-step salvia drug test kits. The first is Patent No. US7,741,103 B2, which was filed March 21, 2006, published October 11, 2007, and issued June 22, 2010 ("Patent No. 1"). This patent related to Dr. Guirguis' invention of a fluid collection and drug testing device, with an immunoassay-based fingerprint acquisition pad. BTP

continued work on improving the design and functionality of the one-step saliva test kit, with or without the fingerprint feature. The second patent is Patent No. US7,879,623 B2 filed February 11, 2008, published August 14, 2008, and issued February 1, 2011 ("Patent No. 2"). One key aspect of the second patent is Dr. Guirguis' invention of an effective method for compression of the fluid and sealing the collection device.

11.     Dr. Guirguis originally developed his one-step drugs of abuse test kits for a British law enforcement client, and entered into a relationship through his company, Fingerprint Biotech, LLC, with ACON Laboratories, Inc. ("ACON") under a nondisclosure agreement to supply salvia test strips and build the first production prototype unit. During this relationship, Dr. Guirguis disclosed trade secrets and proprietary and confidential information to ACON and its employees relating to his one-step drug test inventions. Specifically, Dr. Guirguis provided critical information relating to closure and compression of one-step devices to ACON. Subsequently, ACON sold its rapid diagnostic business to another company, resulting in ACON's termination of this project to develop the one-step drug test kits.

12.     Thereafter, in May 2008, BTP contacted several vendors to supply test strips for a one-step drug of abuse rapid test kit, model DRG-8260, which was also designed for its British law enforcement client. The DRG-8260 was one of the preferred embodiments and improved designs incorporated in Dr. Guirguis' Patent Application No.12/029,418 previously filed February 11, 2008 for BTP's Patent No. 2, discussed above. Specifically, BTP was interested in engaging an original equipment manufacturer ("OEM") for its test strips, based on certain criteria and conditions: (1) the vendor was an established manufacturer of saliva and urine test strips; (2) the vendor entered into a non-disclosure agreement to adapt its strips in BTP's devices; (3) the vendor had an excellent reputation in the industry and was duly licensed by the

United States Federal Drug Administration; (4) the vendor could provide strips in various forms (e.g., for use in cassette, half-cylinder, cylinder formats); (5) the vendor was available to enter into a future OEM agreement to manufacture and package BTP's devices; (6) the vendor was cost-competitive; and (7) the vendor was experienced in making test strips in other areas of rapid diagnostics (e.g., infectious diseases), which could be adapted to BTP's devices.

13.     Significantly, while the potential vendors approached by BTP made various strip carriers, none had a "one-step" rapid diagnostic device.

14.     Among these potential vendors, BTP contacted Hemosure, Inc., a California corporation controlled, upon information and belief, by Wan. BTP's inquiry to Hemosure was answered by Sherry Wang ("Wang"), who responded on behalf of a different entity, WHPM-US, with information relating to test strips. WHPM did not then manufacture or sell one-step salvia drug tests, but instead Wang, on behalf of WHPM, stated that it made test strips for "Pipette cassettes, dip cards or self-contained cups." WHPM representative Wang specifically requested BTP's "plastic device," purportedly to supply custom sheets. BTP declined to provide its device to WHPM, supplying pictures instead. WHPM then provided BTP with a sample package of test strips. Shortly thereafter, Dr. Guirguis traveled to California to meet with WHPM.

15.     On or about May 29, 2008, Dr. Guirguis met with Wan of WHPM at its offices in El Monte, California. At that meeting, the parties agreed to be mutually bound by a non-disclosure agreement ("NDA"). In addition to offering WHPM's test strips, Wan expressed an interest in building the production molds for BTP's "one-step" saliva test kits, as well as in manufacturing and packaging BTP's devices. Expressing great interest in BTP's devices, Wan and WHPM offered to pay for the production molds and the tooling for constructing BTP's devices, unlike other potential OEM manufacturers.

16.     BTP elected to explore a manufacturing relationship with WHPM, but insisted that the parties finalize the NDA before proceeding.  BTP also insisted on paying for the molds and tooling for producing a prototype, underscoring that such items belonged to BTP for its exclusive use.

17.     On June 27, 2008, Wan provided WHPM-US's NDA form to BTP.  Though BTP was the party providing proprietary information about one-step devices to WHPM, the form incorrectly provided that WHPM-US was the "disclosing party" and BTP was the "recipient," and inexplicably designated Texas as the choice of law.  BTP promptly corrected the NDA to add BTP as a "disclosing party," returning it to WHPM the same day.  On July 1, 2008, Wan and WHPM agreed to BTP's revisions, adding BTP as a disclosing party, and that the NDA is "governed by and construed in accordance with the laws of California."

18.     Though the agreed-upon NDA's terms were finalized as of July 1, 2008, Wan and WHPM-US, continued to delay executing it.  When raised by BTP on July 10, 2008, Wan apologized for the delay, and promised to send a signed NDA as soon as possible.  It was not until August 5, 2008, after BTP refused to disclose its CAD drawings for the mold, that WHPM-US finally signed and returned the NDA.

19.     The NDA, "made as of June 2008," states in pertinent part:

WHEREAS Both Discloser and Recipient own, possess or control certain trade secrets, and proprietary and confidential information acquired through the expenditure of time, effort and money, of a technical and business nature relating to Rapid Diagnostics & Point of Care Testing Markets (the "Information"); and

WHEREAS Recipient desires to receive, and Discloser is willing to supply, the information on the terms and conditions set out herein, solely for the purpose of investigating a Possible business arrangement (the "Purpose");

NOW THEREFORE THIS AGREEMENT WITNESSES that in consideration of the premises and the covenants and agreements herein contained the parties hereto agree as follows:

1.      Discloser shall at its discretion provide such of the Information to Recipient as is required for the Purpose, verbally or in writing. Nothing in this Agreement obligates Discloser to make any particular disclosure of Information.

2.      All right, title and interest in and to the Information shall remain the exclusive property of Discloser and the Information shall be held in trust and confidence by Recipient of Discloser. No interest, license or any right respecting the Information, other than expressly set out herein, is granted to Recipient under this Agreement by implication or otherwise.

3.      Recipient shall use all reasonable efforts to protect Discloser's interest in the Information and keep it confidential, using a standard of care no less than the degree of care that Recipient would be reasonably expected to employ for his own similar confidential Information. In particular Recipient shall not directly or indirectly disclose, allow access to, transmit or transfer the Information to a third party without the Discloser's prior written consent. Recipient shall disclose the Information only to those persons who have a need to know the Information for the Purpose and who have been approved by the Discloser to receive the Information. Recipient shall, prior to disclosing the information to such employees and consultants, issue appropriate instructions to them to satisfy its obligations herein and obtain their written agreement to receive and use the information on a confidential basis on the same conditions as contained in this Agreement.

4.      The information shall not be copied, reproduced in any form or stored in a retrieval system or data base by Recipient without the prior written consent of Discloser, except for such copies and storage as may reasonably be required internally by Recipient for the Purpose.

5.      The obligations of the Recipient under paragraphs 3, 4 and 5 shall not apply to Information:

    a.  Which at the time do disclosure is readily available to the trade or the public;
    b.  Which Recipient can establish, by documented and competent evidence, was in its possession prior to the date of disclosure of such information by Discloser; or
    c.  Any information which the Recipient is by law required to disclose.

. . .

(emphasis supplied).  The NDA was signed by Wan and Dr. Guirguis.  A copy of the NDA is

attached hereto as Exhibit "A."

20.     Thereafter, Dr. Guirguis began regular communications with Defendants, to and

from Virginia, to construct molds and build prototypes of one-step devices using BTP's

7

technology and intellectual property. The parties contemplated that BTP would be working with representatives from WHPM in the U.S. and China. Wan established a team consisting of himself, several WHPM-China scientists, and a WHPM-China sales director, with whom BTP would work under the NDA, and Dr. Guirguis agreed in writing to their involvement. Wan regularly participated in communications between Dr. Guirguis and the WHPM-China scientists and sales director, and was typically involved in conference calls, as a participant and translator as the WHPM-China scientists did not speak English. Wan also regularly participated in email communications between Dr. Guirguis and the WHPM-China scientists and other representatives, either as a sender, receiver, or copyee.

21.     From the beginning, and repeatedly thereafter, Wan and WHPM-US and WHPM-China represented to BTP that WHPM-US and WHPM-China were one and the same. In addition, WHPM-US and WHPM-China continuously held themselves out as one and the same or within the same corporate family. For example, both entities were listed on the same trade show brochures, and used the same website URL www.whpm.com, with the suffix ".cn" added for the Chinese version, WHPM-China.

22.     Over approximately the next 14 months, BTP provided extensive confidential and proprietary information and trade secrets to direct and assist WHPM in properly constructing prototypes of the one-step devices. The highly sensitive information which BTP provided to WHPM included both information contained in BTP's pending patent applications, as well as other trade secrets and confidential and proprietary information.

23.     The information which BTP provided under the NDA to Wan, WHPM-US, WHPM-China (including Siyu Lei, Chunhua Yuan, Zhijing Wan, and Kevin Chang) included, *inter alia:*

(a)     the CAD drawings for a one-step drug test device; and

(b)     critical information relating to:

    (i)      the closure of the one-step devices;

    (ii)     compression within the one-step devices;

    (iii)    achieving effective reaction times in the one-step devices;

    (iv)    positioning of the test strips in the one-step devices; and

    (v)     avoiding leakage within the one-step devices.

24.     During this period, Dr. Guirguis taught WHPM-US and WHPM-China how to correctly produce the one-step devices, repeatedly providing confidential and proprietary information and trade secrets in answering and resolving the numerous questions and problems raised by WHPM. In order to get the production process for BTP's one-step test kits underway, Dr. Guirguis arranged to spend a week in June 2009 in Beijing, China, planning to visit WHPM-China's facilities and resolve any remaining issues. When Dr. Guirguis arrived in Beijing, WHPM-China refused to allow him access to their facilities, claiming a health inspection due to the then-current Avian flu virus. Instead, during several days of meetings, WHPM had two scientists and a director of sales (Siyu Lei, Chunhua Yuan, and Kevin Chang, respectively) "pick" Dr. Guirguis' "brain," as a WHPM-China representative later informed him. During these meetings, the WHPM-China personnel conveyed Wan's regards to Dr. Guirguis, and represented that they reported daily to Wan on the progress of BTP's project. In addition, the WHPM-China personnel confirmed directly to Dr. Guirguis that they were maintaining the confidentiality of BTP's trade secrets and propriety and confidential information.

25.     Despite being unable to visit WHPM-China's facilities in Beijing, BTP continued working with Wan, WHPM-US, and WHPM-China to complete the process of building

prototypes of the one-step devices, as BTP had invested much time and money in educating WHPM. In the summer of 2009, BTP ordered the production of 1,000 units of BTP's devices from WHPM, and BTP proceeded to conduct evaluation tests of the devices in the United States and United Kingdom.

26.    Meanwhile in March 2009, unbeknownst to BTP, Wan, his sister Zhijing Wan, Siyu Lei, and Chunhua Yuan from WHPM-China had filed patent applications in Australia and Canada, and an international patent application with World Intellectual Property Organization (the "Wan Patent Applications"). The Wan Patent Applications purported to cover the one-step devices invented by Dr. Guirguis, which part of BTP's pending patent applications, as well as in BTP's trade secrets and propetiary and confidential information which Dr. Guirguis had conveyed to Wan, WHPM-US, and WHPM-China under the NDA. Defendants knew, or had to know, that the intellectual property in the Wan Patent Application derived from BTP's Patent Nos. 1 and 2, trade secrets, and other proprietary and confidential information.

27.    Incredibly, despite Dr. Guirguis' Patent Nos. 1 and 2 having already been published, the Wan Patent Applications did not reference or acknowledge BTP's Patent Nos. 1 and 2, and likewise disregarded the NDA. Instead, the Wan Patent Applications appeared to copy BTP's Patent Nos. 1 and 2, and avoided any mention of their relevance.

28.    Among other things, the Wan Patent Applications in describing the Related Art, falsely represented that the pads for collecting the specimen in the current devices were problematic, primarily "since the pads cannot be squeezed," and "[a]ccordingly, it is desirable and advantageous to develop a novel device, which have [sic] a separate section to implement sample collection independently and still maintain the functionality of one-step sample assay." Contrary to the those representations in the Wan Patent Applications, the one-step devices

already invented by Dr. Guirguis had a collection pad/sponge which could be squeezed, as

Defendants knew.

29.     Further, the Invention Summary in the Wan Patent Applications is strikingly

similar to BTP's Patent No. 2, with minor wording changes, such as substituting "section" for the

term "member." For example, the first paragraph of the Invention Summary of Dr. Guirguis'

Patent No. 2 reads as follows:

> According to an embodiment, the present invention provides an apparatus
> comprising: a sample receiving member, to receive a fluid sample; a
> sample retention member, in fluid communication with the sample
> receiving member, to retain a portion of the fluid sample; and at least one
> membrane test strip, in fluid communication with the sample receiving
> member, to indicate the presence or absence of at least one analyte in the
> fluid sample.

In contrast, the first paragraph of the Invention Summary in the Wan Patent Application reads:

> The present invention provides a device for collecting and analyzing a
> biological fluid. The device contains a sample collecting section having at
> least one collection pad for collecting a sample of the biological fluid, a
> sample accommodating section operatively engageable with the sample
> collecting section for extracting and accommodating the sampled collected
> by the sample collecting section, and a sample analyzing section, disposed
> within the sample accommodating section and having a sample analyzing
> means in fluid communication with the sample extracted and
> accommodated within the sample accommodating section.

30.     Tellingly, the Wan Patent Applications, in listing approximately 50 prior relevant

patents, failed to disclose Dr. Guirguis' Patent Nos. 1 and 2. Instead, the Wan Patent

Applications merely listed an old patent by Dr. Guirguis from 1990 relating to urinal cups.

31.     Further unknown to BTP, WHPM-US filed several trademark applications with

the United States Patent and Trademark Office ("PTO"), purporting to claim certain trademarks

used in connection with one-step salvia drug test kits based on BTP's technology and intellectual

property. On August 6, 2009 WHPM-US filed a trademark application for the mark "Oral-

Cube" used in connection with one-step salvia drug test kits. WHPM-US's trademark application was deficient as WHPM-US did not present the first date of use and first date of use in commerce. By a supplemental submission dated June 23, 2010, WHPM-US claimed that the first dates of use and first use in commerce were July 29, 2009, and included two flyers depicting BTP's one-step salvia drug test kit. Apparently in reliance on WHPM-US's false representations, the PTO registered the mark "Oral-Cube" on October 5, 2010, issuing serial no. 777799222.

32.     Also unknown to BTP, on December 4, 2009, Wan filed a trademark application for the mark "First Sign" to be used in with connection drug testing, with the mark's owner, John Wan, identified as a California corporation. By letter of March 12, 2010 to Wan, the PTO advised that the application was deficient in numerous respects, including that the applicant failed to specify a filing basis for the application. The application was deemed abandoned by the PTO after Wan failed to respond to the PTO inquiry.

33.     Likewise, WHPM-US filed another trademark application on January 25, 2011 for the mark "Swab Cube" to be used in connection with salvia drug test kits. This application likewise failed to state the first date of use and first date of use in commerce, and is currently pending.

34.     Also unbeknownst to BTP, during this same time period, the United States Food and Drug Administration ("FDA") conducted an inspection of WHPM-US, and on March 19, 2009 issued a Warning Letter to WHPM-US relating to "significant" regulatory "violations."

35.     Without knowledge or notice of these multiple deceits by Defendants, in June 2010, BTP contacted Defendants to initiate production of one-step drug test devices for BTP. WHPM responded by asserting for the first time that it could not supply the devices or parts to

BTP for the U.S. market because it already had an "exclusive agreement with one of our distributor [sic] in USA." BTP replied that the one-step devices were BTP's technology and property, and that Defendants had no right to use or sell them. In an attempt to resolve the dispute, BTP and WHPM discussed entering into an OEM supply agreement, but failed to reach agreement.

36.    At no time did BTP or Dr. Guirguis give Defendants any license, permission, or other authority to use or sell any one-step devices based on BTP's technology and intellectual property, or the valuable trade secrets and propriety and confidential information BTP gave to Defendants under the NDA. Instead, under the express terms of paragraph "2" of the NDA: "[a]ll right, title and interest in and to the Information shall remain the exclusive property of Discloser and the Information shall be held in trust and confidence by Recipient of Discloser. No interest, license or any right respecting the Information, other than expressly set out herein, is granted to Recipient under this Agreement by implication or otherwise."

37.    Upon information and belief, Defendants have engaged in substantial sales of one-step drug tests developed by BTP. Through January 2011, it is reasonably estimated that WHPM-US has sold approximately $4 million to $9 million on a wholesale basis in the United States alone of one-step drug test kits as a result of its theft of BTP's trade secrets and proprietary and confidential information. The one-step drug test kits are marketed under various names, and sold through distributors and retailers across the country, as well as online, such as through amazon.com. For example, an order of a Salivaconfirm salvia drug test kit from amazon.com will result in the delivery of WHPM's "Oral Cube," a device employing BTP's technology and intellectual property.

## Count I
### (Injunctive Relief)

38.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 37, above, as if fully set forth herein.

39.    As set forth above, Plaintiff has suffered an irreparable injury as a consequence of the action by Defendants.

40.    Plaintiff does not have an adequate remedy at law.  Because the extent of the disclosure by Defendants of Plaintiff's trade secrets and proprietary and confidential information is unknown and cannot be quantified, and Defendants have used and continue to use Plaintiff's trade secrets and proprietary and confidential information to unfairly compete with Plaintiff, it is impossible to determine the harm sustained by Plaintiff.

41.    Considering the balance of hardships between the Plaintiff and Defendants, a remedy in equity is warranted.  The benefit to Plaintiff in obtaining injunctive relief far outweighs the potential harm to Defendants if this Court were to grant injunctive relief.  The likelihood of harm to Defendants if injunctive relief were granted is minimal given that Defendants have used Plaintiff's trade secrets and confidential and proprietary information to unfairly compete with Plaintiff or otherwise.

42.    There exists a strong likelihood that Plaintiff will succeed on the merits of its claim considering the wrongdoings by Defendants, their breach of the NDA and their violations of statutory and common law as set forth herein.

43.    The public interest is best served by granting injunctive relief because the public is best served if blatant wrongdoers are enjoined from continuing improper activities and it is in the public interest to protect trade secrets and proprietary and confidential information.

WHEREFORE, Plaintiff respectfully requests:

(i) a preliminary and/or permanent injunction against Defendants, any of their agents, employees and/or all other persons, firms or corporations, acting or claiming to act on their behalf, or in concert with any of the Defendants, from disclosing any of Plaintiff's trade secrets and proprietary and confidential information, for any purpose to any other person, including, but not limited to, customers, partners, competitors, the general public or any other third party, and to require Defendants to return to Plaintiff all trade secrets misappropriated by Defendants and currently in their possession;

(ii) a preliminary and/or permanent injunction against Defendants, any of their agents, employees and/or all other persons, firms or corporations, acting or claiming to act on their behalf, or in concert with any of the Defendants, from producing, manufacturing or selling one-step salvia drug test kits; and

(iii) for such other and further relief as the Court may deem just and proper.

### Count II
### (Breach of Contract)

44.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 37, above, as if fully set forth herein.

45.     The NDA, or Non-Disclosure Agreement, by its express terms, sets forth the terms and conditions concerning the disclosure and use of "certain trade secrets, and proprietary and confidential information."

46.     Defendants by their actions set forth, have breached the agreed terms and conditions of the NDA, including, but not limited to: (1) their breach of the obligations to hold "in trust and confidence" the trade secrets, and proprietary and confidential information disclosed by Plaintiff; (2) their breach of the obligations to "use all reasonable efforts to protect

[Plaintiff's] interest in the information and keep it confidential;" (3) their direct and indirect disclosure, allowing access to, transmitting or transferring the information to third parties without Plaintiff's prior written consent; and, most egregiously, (4) their misuse and theft of BTP's trade secrets and propriety and confidential information in utter disregard of their agreement that "[a]ll right, title and interest in and to the Information shall remain the exclusive property" of BTP as the owner and discloser, which they agreed to hold "in trust" in favor of Plaintiff.

47.     As a result of the foregoing breaches of contract by Defendants, Plaintiff has incurred substantial monetary damages.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants in the amount of not less than Twenty Million Dollars ($20,000,000) in compensatory damages, together with prejudgment interest, attorneys' fees and expenses, and costs under the Agreement, and for such other and further relief as the Court deems just and proper.

## Count III
### (Contractual Indemnification)

48.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 37, above, as if fully set forth herein.

49.     The NDA provides: "The Recipient shall indemnify and save harmless the Discloser from all damages, losses, expenses and costs whatsoever resulting from the breach of this Agreement by the Recipient."

50.     Defendants by their actions set forth, have breached the agreed terms and conditions of the NDA, including, but not limited to: (1) their breach of the obligations to hold "in trust and confidence" the trade secrets, and proprietary and confidential information

disclosed by Plaintiff; (2) their breach of the obligations to "use all reasonable efforts to protect [Plaintiff's] interest in the information and keep it confidential;" (3) their direct and indirect disclosure, allowing access to, transmitting or transferring the information to third parties without Plaintiff's prior written consent; and, most egregiously, (4) their misuse and theft of BTP's trade secrets and propriety and confidential information in utter disregard of their agreement that "[a]ll right, title and interest in and to the Information shall remain the exclusive property" of BTP as the owner and discloser, which they agreed to hold "in trust" in favor of Plaintiff.

51.     As a result of the foregoing breaches of contract by Defendants, Plaintiff has incurred and continues to incur substantial monetary damages, losses, and costs and expenses, including attorneys' fees, which Defendants are contractually obligated to pay.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants in an amount to be determined at trial, together with prejudgment interest, attorneys' fees and expenses, and costs under the Agreement, and for such other and further relief as the Court deems just and proper.

## Count IV
### (Violation of the Virginia Trade Secrets Act: Va. Code § 59.1-336, *et seq.*)

52.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 37, above, as if fully set forth herein.

53.     As set forth above, Plaintiff disclosed certain trade secrets to Defendants, including, but not limited to,

(a)     Plaintiff's CAD drawings for a one-step drug test device; and

(b)     Plaintiff's critical information relating to:

(i)     the closure of the one-step devices;

(ii)    compression within the one-step devices;

(iii)   achieving effective reaction times in the one-step devices;

(iv)    positioning of the test strips in the one-step devices; and

(v)     avoiding leakage within the one-step devices.

54.     These trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use.

55.     Plaintiff undertook reasonable efforts under the circumstances to maintain secrecy of these trade secrets.

56.     By their actions set forth above, Defendants have misappropriated these trade secrets. Defendants disclosed or used these trade secrets developed by Plaintiff without its express or implied consent, and knew, or had reason to know, that their knowledge of the trade secrets was acquired either under circumstances giving rise to a duty to maintain the secrecy, or derived from or through a person who owed such a duty to Plaintiff. Such actions constitute a misappropriation of trade secrets and other improper activity in violation of the Virginia Trade Secrets Act, Va. Code § 59.1-336, *et. seq*.

57.     The misappropriation of trade secrets by Defendant was intentional, willful and malicious.

58.     As a result of the misappropriation of trade secrets by Defendants, Plaintiff has suffered and continues to suffer immediate and irreparable injury.

59.     Plaintiff has no adequate remedy at law. Because Defendants have used Plaintiff's trade secrets to unfairly compete with Plaintiff, and the extent of the disclosure by

Defendants of Plaintiff's trade secrets, is unknown and cannot be quantified, it is impossible to determine the harm sustained by Plaintiff.

60.   Considering the balance of hardships between the Plaintiff and Defendants, a remedy in equity is warranted. The benefit to Plaintiff in obtaining injunctive relief far outweighs the potential harm to Defendants if this Court were to grant injunctive relief. The likelihood of harm to Defendants if injunctive relief is granted is minimal given that Defendants have used the trade secrets to unfairly compete with Plaintiff or otherwise.

61.   There exists a strong likelihood that Plaintiff will succeed on the merits of its claim considering the wrongdoings by Defendants, their breach of the NDA and their violations of the Virginia Trade Secrets Act.

62.   The public interest is best served by granting injunctive relief because the public is best served if blatant wrongdoers are enjoined from continuing improper activities and it is in the public interest to protect trade secrets.

WHEREFORE, Plaintiff respectfully requests:

(i) an award of compensatory damages under the Virginia Trade Secrets Act against Defendants, jointly and severally, in the amount of at least Twenty Million Dollars ($20,000,000), plus prejudgment interest thereon;

(ii) an award of punitive damages under the Virginia Trade Secrets Act against each Defendant, jointly and severally, in the statutory amount of Three Hundred Thousand Dollars ($350,000);

(iii) an award of attorneys' fees, expenses, and costs under the Virginia Trade Secrets Act against each Defendant, jointly and severally, in an amount to be determined at trial;

(iv) a preliminary and/or permanent injunction against Defendants, any of their agents, employees and/or all other persons, firms or corporations, acting or claiming to act on their behalf, or in concert with any of the Defendants, from disclosing any of Plaintiff's trade secrets for any purpose to any other person, including, but not limited to, customers, partners, competitors, the general public or any other third party, and to require Defendants to return to Plaintiff all trade secrets misappropriated by Defendants and currently in their possession;

(v) a preliminary and/or permanent injunction against Defendants, any of their agents, employees and/or all other persons, firms or corporations, acting or claiming to act on their behalf, or in concert with any of the Defendants, from producing, manufacturing or selling one-step salvia drug test kits; and

(vi) for such other and further relief as the Court deems just and proper.

## Count V
### (Unjust Enrichment)

63.     Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 37, above, as if fully set forth herein.

64.     As set forth above, Plaintiff has conferred a benefit on Defendants, including, but not limited to, highly sensitive trade secrets and confidential and proprietary information which BTP provided to WHPM relating to the effective creation and production of one-step drug test devices, including, but not limited to:

(a)     Plaintiff's CAD drawings for a one-step drug test device; and

(b)     Plaintiff's critical information relating to:

      (i)     the closure of the one-step devices;

      (ii)     compression within the one-step devices;

20

(iii)    achieving effective reaction times in the one-step devices;

(iv)    positioning of the test strips in the one-step devices; and

(v)    avoiding leakage within the one-step devices.

65.    Defendants knew or had knowledge of the conferring of the foregoing benefit. Defendants' acceptance or retention of the benefit under the circumstances as described above renders it inequitable for Defendants to retain the benefit without paying for its value.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants in the amount of at least Twenty Million Dollars ($20,000,000) in compensatory damages, together with prejudgment interest, attorneys' fees and expenses, and the costs of this action, and for such other and further relief as the Court deems just and proper.

## Count VI
### (Violation of Virginia Conspiracy Act:
### Va. Code §18.2-499, *et seq*.)

66.    Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 37, above, as if fully set forth herein.

67.    Alternatively, WHPM-US and WHPM-China are separate and distinct legal entities.

68.    As set forth above, Defendants Wan, WHPM-US, and WHPM-China have combined for the purpose of injuring Plaintiff in its business, including, but not limited to, to work in concert with each other to willfully and maliciously injure BTP in its trade and business and to engage in numerous unlawful acts, including: (1) willfully breaching the agreed terms and conditions of the NDA, including, but not limited to their breach of the obligations to: (a) to hold "in trust and confidence" the trade secrets, and proprietary and confidential information disclosed by Plaintiff; (b) to "use all reasonable efforts to protect [Plaintiff's] interest in the

information and keep it confidential;" (c) their direct and indirect disclosure, allowing access to,

transmitting or transferring the information to third parties without Plaintiff's prior written

consent; and, most egregiously; (d) their misuse and theft of BTP's trade secrets and propriety

and confidential information in utter disregard of their agreement that "[a]ll right, title and

interest in and to the Information shall remain the exclusive property" of BTP as the owner and

discloser, which they agreed to hold "in trust" in favor of Plaintiff; and (2) misappropriating

Plaintiff's trade secrets and proprietary and confidential information, including, but not limited

to:

    (a)    Plaintiff's CAD drawings for a one-step drug test device; and

    (b)    Plaintiff's critical information relating to:

        (i)    the closure of the one-step devices;

        (ii)    compression within the one-step devices;

        (iii)    achieving effective reaction times in the one-step devices;

        (iv)    positioning of the test strips in the one-step devices; and

        (v)    avoiding leakage within the one-step devices.

    69.    The actions by Defendants have been intentional, willful and malicious.

    70.    As a result of the actions by Defendants, Plaintiff has incurred substantial

damages.

    WHEREFORE, Plaintiff respectfully requests:

    (i) an award of compensatory damages under the Virginia Conspiracy Act against

Defendants, jointly and severally, in the amount of at least Twenty Million Dollars

($20,000,000), together with prejudgment interest and the costs of this Action;

(ii) an award of punitive damages under the Virginia Conspiracy Act against each Defendant, jointly and severally, in the amount of treble damages of the compensatory damages sustained by Plaintiff;

(iii) an award of attorneys' fees, expenses, and costs under the Virginia Conspiracy Act against each Defendant, jointly and severally, in an amount to be determined at trial;

(iv) a preliminary and/or permanent injunction against Defendants, any of their agents, employees and/or all other persons, firms or corporations, acting or claiming to act on their behalf, or in concert with any of the Defendants, from disclosing any of Plaintiff's trade secrets and proprietary and confidential information for any purpose to any other person, including, but not limited to, customers, partners, competitors, the general public or any other third party, and to require Defendants to return to Plaintiff all trade secrets and proprietary and confidential information, misappropriated by Defendants and currently in their possession;

(v) a preliminary and/or permanent injunction against Defendants, any of their agents, employees and/or all other persons, firms or corporations, acting or claiming to act on their behalf, or in concert with any of the Defendants, from producing, manufacturing or selling one-step salvia drug test kits; and

(vi) for such other and further relief as the Court deems just and proper.

## Count VII
### (Deceit)

71.    As set forth above Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 37, above, as if fully set forth herein.

72.    Defendants concealed numerous material facts.  On or about May 29, 2008 and thereafter Defendants Wan, WHPM-US, and WHPM-China concealed that, including but not limited to the following: (1) they were not holding "in trust and confidence" the trade secrets,

and proprietary and confidential information disclosed by Plaintiff; (2) they were not "us[ing] all reasonable efforts to protect [Plaintiff's] interest in the information and keep it confidential;" and (3) they were misappropriating BTP's trade secrets and propriety and confidential information, despite having agreed that "[a]ll right, title and interest in and to the Information shall remain the exclusive property" of BTP as the owner and discloser of BTP's trade secrets and propriety and confidential information and that no "interest, license or any right respecting the Information" was granted to Defendants.

73.    Defendants Wan, WHPM-US and WHPM-China also repeatedly represented to BTP that WHPM-US and WHPM-China were one and the same.  WHPM-US and WHPM-China continuously held themselves out as one and the same or within the same corporate family. Defendants Wan, WHPM-US and WHPM-China failed to disclose to BTP that WHPM-US and WHPM-China were separate legal entities.

74.    On or about March 4, 2009, Defendants concealed that they had filed patent applications in Australia and Canada, and an international patent application with World Intellectual Property Organization, purporting to cover the one-step devices invented by Dr. Guirguis, which were part of BTP's pending patent applications, as well as BTP's trade secrets and proprietary and confidential information which Dr. Guirguis had conveyed to Wan and WHPM under the NDA.

75.    On or about March 19, 2009, Defendants concealed that the United States Food and Drug Administration had issued a Warning Letter to WHPM-US relating to "significant" regulatory "violations" following an inspection.

24

76.    In June 2009 during Dr. Guirguis' visit to China, WHPM-China falsely represented that it was maintaining the confidentiality of BTP's trade secrets and propriety and confidential information.

77.    On or about August 6, 2009, Defendants concealed that WHPM-US had filed a trademark application for the mark "Oral-Cube" used in connection with one-step salvia drug test kits.

78.    On or about December 4, 2009, Defendants concealed that Wan filed a trademark application for the mark "First Sign" to be used in with connection drug testing. Defendants also concealed that on or about January 25, 2011, WHPM-US filed another trademark application for the mark "Swab Cube" to be used in connection with salvia drug test kits.

79.    Defendants further concealed WHPM it had entered into an "exclusive agreement with one of our distributor [sic] in USA" to supply the one-step devices covered by BTP's technology and intellectual property and that WHPM, on information and belief, has engaged in substantial sales of one-step drug tests developed by BTP.

80.    The foregoing concealment of material facts were made by Defendants with intent to mislead. Defendants knew that Plaintiff was acting upon the assumption that the facts did not exist.

81.    The foregoing concealment of material facts by Defendants was intentional, willful and malicious.

82.    Plaintiff reasonably relied on the concealment of the material facts by Defendants.

83.    As a result of Plaintiff's reasonable reliance on the foregoing concealment of material facts, Plaintiff incurred substantial monetary damages.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants in the amount of at least Twenty Million Dollars ($20,000,000) in compensatory damages, punitive damages in the amount of at least Sixty Million Dollars ($60,000,000), together with prejudgment interest, attorneys' fees and expenses, and the costs of this action, and for such other and further relief as the Court deems just and proper.

### Count VIII
### (Unfair Competition)

84.     As set forth above Plaintiff incorporates by reference the allegations set forth in paragraphs 1 through 37, above, as if fully set forth herein.

85.     By their actions set forth above, Defendants have engaged in unfair competition in violation of the common law of Virginia.

86.     As a consequence of the foregoing actions by Defendants, Plaintiff has incurred substantial monetary damages.

WHEREFORE, Plaintiff respectfully requests judgment against Defendants in the amount of at least Twenty Million Dollars ($20,000,000) in compensatory damages, together with prejudgment interest, attorneys' fees and expenses, and the costs of this action, and for such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

Robert W. Ludwig, Jr.
Salvatore Scanio
James E. Tompert  (Bar No. 25883)
jtompert@ludwigrobinson.com
Ludwig & Robinson, PLLC
818 Connecticut Ave., Suite 750
Washington, D.C. 20006-2712
Tel: (202) 289-1800
Fax: (202) 289-1804

Dated: April 20, 2011

*Attorneys for Biotechpharma, LLC*